## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

_____
                                        )
CORDIS CORPORATION,                     )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )          C.A. No. 98-197-SLR
                                        )
BOSTON SCIENTIFIC CORPORATION,          )
and SCIMED LIFE SYSTEMS, INC.,          )
                                        )
            Defendants.                 )
_____ )


## BSC'S OPENING SUBMISSION ON ITS PROPOSED
## SUPPLEMENTAL FINDINGS ON INEQUITABLE CONDUCT


<div style="margin-left:50%">

Josy W. Ingersoll (I.D. #1088)
Karen E. Keller (I.D. #4489)
YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6600
kkeller@ycst.com

Attorneys for Defendants
Boston Scientific Corporation,
and Boston Scientific Scimed, Inc.
(formerly Scimed Life Systems, Inc.)

</div>

Of Counsel:
George E. Badenoch
Albert J. Breneisen
Mark A. Chapman
William M. Merone
Huiya Wu
KENYON & KENYON LLP
One Broadway
New York, New York 10004
(212) 425-7200

November 13, 2006

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDINGS.................................................................. 1

SUMMARY OF PROPOSED SUPPLEMENTAL FINDINGS ....................................... 2

EVIDENTIARY SUPPORT FOR PROPOSED SUPPLEMENTAL FINDINGS ............ 4

I.    Intent to Mislead by Failing to Disclose Hillstead................................................. 4

      A.    Dr. Fischell Read the EPO Search Report and At Least Looked at
            Hillstead during the '312 Prosecution ....................................................... 4

            1.    The Evidence Supports a Finding that Dr. Fischell Read the
                  EPO Search Report and At Least Looked at Hillstead
                  during the '312 prosecution ........................................................ 5

            2.    Dr. Fischell's Contrary Testimony that He Was Not Aware
                  of Hillstead until April 1998 Is Not Credible ............................... 8

            3.    Cordis' Good Faith Explanations Are Not Credible.................... 12

      B.    Dr. Fischell Cultivated Ignorance about the Existence and
            Materiality of Hillstead during the '312 Prosecution ............................. 14

      C.    Mr. Rosenberg Also Cultivated Ignorance about the Existence and
            Materiality of Hillstead during the '312 Prosecution ............................. 18

II.   The Unenforceability of the '370 Patent ............................................................. 22

      A.    The Inequitable Conduct Committed during the '312 Prosecution
            Tainted the '370 Prosecution ................................................................... 22

      B.    Dr. Fischell, Mr. Rosenberg (and Cordis) Did Not Cure the
            Inequitable Conduct during the '370 Prosecution.................................... 23

CONCLUSION ........................................................................................................... 25

DB01:2233188.1                                                                                          054152.1001

Pursuant to the Court's order (D.I. 322) and in accordance with the Federal Circuit's mandate, defendants Boston Scientific Corporation and Boston Scientific Scimed, Inc. (formerly Scimed Life Systems, Inc.) (collectively "BSC") respectfully submit their proposed supplemental findings on inequitable conduct with supporting evidence, in support of this Court's unenforceability judgment.

## NATURE AND STAGE OF PROCEEDINGS

After a two-day bench trial, this Court held the Fischell patents, U.S. Patent No. 5,643,312 (the "'312 patent") (PX-5000)[1] and U.S. Patent No. 5,879,370 (the "'370 patent") (PX-5001), unenforceable due to inequitable conduct. D.I. 255, 256; *Cordis Corp. v. Medtronic AVE, Inc.*, 194 F. Supp. 2d 323, 362-68 (D. Del. 2002). In particular, this Court held that the patentees committed inequitable conduct during the parent '312 prosecution by failing to disclose the prior art Hillstead patent, U.S. Patent No. 4,856,516 (DXB-10045), that they knew, or should have known, was material. *Cordis*, 194 F. Supp. 2d at 367-68. This Court also held that this inequitable conduct carried over to the continuation '370 patent. *Id.* at 368.

Plaintiff Cordis Corporation ("Cordis") appealed from the unenforceability judgment with respect to the '370 patent but not the '312 patent. D.I. 309. On June 29, 2006, without reversing or vacating the judgment, the Federal Circuit remanded the case back to this Court "for supplemental findings on several factual questions pertinent to the issue of inequitable conduct." D.I. 319 at 3-4; *Cordis Corp. v. Boston Scientific Corp.*, Nos. 05-1418, 05-1432, 2006 U.S. App. LEXIS 16621, at *4 (Fed. Cir. June 29, 2006). In particular, the Federal Circuit instructed this Court to provide more specific findings

---

[1] "PX-___" and "DXB-___" refer to the trial exhibit numbers.

about the state of knowledge of one of the inventors, Robert Fischell, and his attorney,

Morton Rosenberg, with respect to Hillstead, which the Federal Circuit found was a

material reference. *Id.* at *4, 11.  The Federal Circuit also instructed this Court to provide

more specific findings about how the inequitable conduct committed during the '312

prosecution carried over to the continuation '370 patent.  *Id.* at *14-15.

## SUMMARY OF PROPOSED SUPPLEMENTAL FINDINGS

BSC submits that this Court should make the following supplemental findings in

support of its unenforceability judgment.

First, with respect to the state of knowledge of Dr. Fischell and Mr. Rosenberg

regarding Hillstead, the Court should find as follows:

1.     Dr. Fischell read the EPO search report, at least looked at the

Hillstead patent, and appreciated that Hillstead disclosed undulating longitudinals

during the '312 prosecution.

2.     Even if Dr. Fischell's assertion that he was not aware of Hillstead

until April 1998 were accepted, that assertion could only be true if he deliberately

and improperly cultivated ignorance about Hillstead and its details.  Dr. Fischell's

review of the July 1995 letter from Mr. Rosenberg put him on notice that the EPO

search report contained information about the existence of potentially material

prior art, including Hillstead.  To the extent that Dr. Fischell did not look at the

search report or the prior art cited therein as particularly relevant at that time, then

he cultivated ignorance by purposefully avoiding obtaining knowledge of the

contents of the search report and the details of Hillstead.

3.     Mr. Rosenberg also deliberately and improperly cultivated

ignorance about Hillstead and its details.  Mr. Rosenberg's review of the EPO

2

search report and Hillstead in connection with the European application in July 1995 put him on notice that his file for the European application contained information about potentially material prior art, including Hillstead.  After he assumed responsibility for the U.S. '312 prosecution, he cultivated ignorance by failing to look in his own European counterpart file, thereby purposefully avoiding refreshing his knowledge about the contents of the search report and the details of the prior art cited therein as particularly relevant, including Hillstead.

Any one of these three findings supports the Court's finding that the patentees knew, or should have known, that Hillstead was material, and that they intended to mislead the Patent Office by failing to disclose Hillstead during the '312 prosecution.

Second, with respect to how the inequitable conduct committed during the '312 prosecution carried over to the continuation '370 patent, the Court should find as follows:

1.      The failure to disclose Hillstead during the '312 prosecution tainted the '370 patent because the claims of the '312 and '370 patents both claim the same subject matter and are closely related with respect to the undulating longitudinal feature disclosed by Hillstead.

2.      The listing of Hillstead in an IDS along with some sixty other references during the '370 prosecution, without advising the examiner about its significance to the critical undulating longitudinal feature relied upon for patentability, or about the earlier failure to disclose it during the '312 prosecution, where the same feature was relied upon to secure allowance of the claims, did not "cure" the inequitable conduct committed during the '312 prosecution.

3

**EVIDENTIARY SUPPORT FOR PROPOSED SUPPLEMENTAL FINDINGS**

The following evidence supports BSC's proposed supplemental findings.

**I.    Intent to Mislead by Failing to Disclose Hillstead**

The Federal Circuit instructed this Court to "address whether, in addition to reading the July 1995 letter from Mr. Rosenberg, Dr. Fischell read the accompanying search report, which referred to various prior art patents, including the Hillstead patent, and whether Dr. Fischell read the Hillstead patent at that time." *Id.* at *11.[2]

As the Federal Circuit understood, there is no dispute that Dr. Fischell read the July 1995 letter from Mr. Rosenberg that enclosed the EPO search report and the six cited references, including Hillstead. DXB-11021; DXB-10004; PX-5313; D.I. 1054,[3] Tr. 839:6-40:13, 848:9-53:1, 912:25-13:5; D.I. 1055 964:4-65:6; *Cordis*, 2006 U.S. App. LEXIS 16621, at *11. This Court should find that, in addition to reading the letter, Dr. Fischell also read the EPO search report, at least looked at Hillstead, and appreciated that Hillstead disclosed undulating longitudinal structures, during the '312 prosecution.

**A.    Dr. Fischell Read the EPO Search Report and At Least Looked at Hillstead during the '312 Prosecution**

There is clear and convincing evidence to show that, at the time he read the July 1995 letter from Mr. Rosenberg enclosing the EPO search report and Hillstead, Dr. Fischell read the search report, at least looked at Hillstead and appreciated that Hillstead

---

[2] This Court does not need to make any supplemental findings regarding the materiality of Hillstead because the Federal Circuit affirmed this Court's finding that Hillstead was material to the '312 prosecution. *Id.* at *4-5. In particular, the Federal Circuit agreed that "Hillstead was the only reference that disclosed undulating longitudinal structures, a feature that was increasingly emphasized during course of the prosecutions of the '312 and '370 patents" and that "a reasonable examiner would have considered Hillstead important in deciding whether to allow the '312 patent." *Id.* at *5.

[3] D.I. 1054 and D.I. 1055 are the trial transcripts for February 9 and 12, 2001, as docketed in the companion case of C.A. 97-550-SLR tried simultaneously with this case.

disclosed undulating longitudinal structures. As set forth with citations below, Dr.

Fischell admits that he understood that Hillstead disclosed undulating longitudinal

structures when he looked at the figures. There is no question that the undulating

longitudinal feature had become critically important to patentability, to the coverage of

competitive stents, and to the value placed on Dr. Fischell's patents by the prospective

purchaser, Johnson & Johnson. Dr. Fischell further admitted that it was his general

practice to look at the figures in prior art patents when he received them, and there is no

reason to believe he would not have followed this practice when he received Hillstead.

Under the circumstances, Dr. Fischell's testimony that he did not become aware of

Hillstead until 1998 is not credible.

### 1. The Evidence Supports a Finding that Dr. Fischell Read the EPO Search Report and At Least Looked at Hillstead during the '312 prosecution

The following evidence supports a finding that Dr. Fischell read the EPO search

report and at least looked at Hillstead during the '312 prosecution.

First, the two-page July 1995 letter that Mr. Rosenberg addressed and sent to Dr.

Fischell enclosed the EPO search report and only six cited references, including

Hillstead, and expressly stated that those materials were "enclosed for [Dr. Fischell's]

review." D.I. 1054, Tr. 839:6-40:13, 848:9-49:2, 852:12-16, 912:25-13:5; DXB-11021;

*Cordis*, 194 F. Supp. 2d at 363, ¶ 37.[4]

Second, the EPO search report was only three pages long, and the second page

identified Hillstead and its figures as "particularly relevant" ("Y" reference) to claim 8 of

---

[4] Dr. Fischell also received a second copy of the EPO search report from Mr. Rosenberg in November 1995 after the European application published. D.I. 1055, Tr. 964:4-65:6; DXB-11413; DXB-11414.

the European application, which was the only European claim that included the critically important undulating longitudinal feature.  D.I. 1054, Tr. 833:6-16, 935:2-36:17; D.I. 1055, 958:2-63:16; DXB-10004; *Cordis*, 194 F. Supp. 2d at 363, ¶¶ 38-39.

Third, when Dr. Fischell received the letter, search report and references in July 1995, he was prosecuting the '312 application himself.  D.I. 1054, Tr. 563:24-64:25, 836:7-10, 840:14-19.  He had previously prosecuted over twenty U.S. applications and he knew that he owed a duty of candor to disclose material prior art to the Patent Office.  He also understood that he alone had to determine whether the prior art in the search report was material, and that Mr. Rosenberg was not advising him about that for the U.S. prosecution.  *Id.*, Tr. 830:12-31:23, 841:11-42:3; *Cordis*, 194 F. Supp. 2d at 362, ¶ 35.

Fourth, by July 1995, Dr. Fischell was "keenly interested" in stent designs and it was his "general practice" upon receiving a search report from Mr. Rosenberg to "look at the pictures" of the cited references to "see if [the pictures] looked like [his] invention." D.I. 1054, Tr. 842:4-43:22, 845:10-46:20, 848:9-53:1.  Dr. Fischell acknowledged that when he looked at the following figure on the front page of Hillstead he recognized that it showed undulating longitudinal structures:



*Id.*, Tr. 853:8-12, 883:7-13, 889:9-16, 922:5-9; DXB-10045, Fig. 2A.

Fifth, by July 1995, Dr. Fischell also understood that the undulating longitudinal feature of his invention was "an important way of distinguishing the prior art."  D.I.

6

1054, Tr. 834:7-38:5, 853:8-16; *Cordis*, 194 F. Supp. 2d at 362, ¶ 36.  On three occasions during the '312 prosecution—in March 1995, June 1996, and November 1996[5]—he added the undulating longitudinal feature to claims of the '312 application and argued to the Patent Office that the prior art did not disclose that specific feature.  D.I. 1054, Tr. 834:7-35:20; PX-5003, Tabs 20, 29, 30, 36; *Cordis*, 194 F. Supp. 2d at 365, ¶¶ 44-45.

Sixth, over the course of the '312 prosecution, Dr. Fischell came to appreciate the importance of obtaining patent claims directed to stents with undulating longitudinals. *Id.* at 364, ¶ 41.  By early 1996, he had seen several new competitive stents that did not have rings but that did have what he considered undulating longitudinals.  D.I. 1054, Tr. 854:22-56:21.  He testified that this awareness was partly responsible for his strong desire by early 1996 to obtain new claims that covered any stent with undulations, whether or not it had rings.  *Id.*, Tr. 855:7-58:1; *Cordis*, 194 F. Supp. 2d at 364-65, ¶ 43.

Finally, the importance of obtaining claims to stents with undulating longitudinals also had important financial implications for Dr. Fischell, which provided him with more than a sufficient motive to deceive the Patent Office.  In March 1996, the Fischells' company, IsoStent, entered into an agreement with Johnson & Johnson ("J&J") under which J&J had an option to purchase the assets of IsoStent—including the '312 application and any resulting patents—for approximately $200 million.  D.I. 1054, Tr. 854:5-21; *Cordis*, 194 F. Supp. 2d at 364-65, ¶ 43.  In early 1998, after the '312 patent issued, the Fischells sold IsoStent to J&J for approximately $52 million.  D.I. 198, Tr. 1102:1-103:10; *Cordis*, 194 F. Supp. 2d at 365, ¶ 47.

---

[5] The '312 patent did not issue until July 1, 1997.  PX-5000.

In sum, this Court should find that Dr. Fischell read the EPO search report, at least looked at the Hillstead patent, and appreciated that Hillstead disclosed undulating longitudinal structures during the '312 prosecution.

### 2. Dr. Fischell's Contrary Testimony that He Was Not Aware of Hillstead until April 1998 Is Not Credible

The Federal Circuit noted that this Court stated in its earlier opinion that "Dr. Fischell and Mr. Rosenberg testified that they did not look at the Hillstead patent until April 1998, despite both having copies of said reference in their respective files since at least July 1995." *Cordis*, 2006 U.S. App. LEXIS 16621, at *10 (quoting *Cordis*, 194 F. Supp. 2d at 365, ¶ 48). The Federal Circuit instructed this Court to explain "whether or to what extent the district court credited that testimony, or whether the court found the testimony not credible in light of other, contrary evidence at trial that could provide a basis for a finding of deceptive intent." *Id.*

This Court should find that Dr. Fischell's testimony that he was not aware of Hillstead until April 1998, despite having a copy of it in his file since July 1995, is not credible. D.I. 1054, Tr. 849:3-22, 850:14-52:11, 853:17-54:4, 887:17-89:8, 915:17-16:8, 917:17-18:3, 921:24-22:12; *Cordis*, 194 F. Supp. 2d at 365, ¶ 48.

In addition to the contrary evidence discussed above, the following evidence supports this credibility finding:[6]

First, Dr. Fischell's initial testimony about whether he looked at Hillstead during the '312 prosecution was equivocal. He testified only that he had "no recollection of having seen" Hillstead in 1995:

---

[6] This credibility finding is also supported by the fact that this Court was the finder of fact who sat through the two-day inequitable conduct bench trial and made subjective

Q.     Isn't it true, Dr. Fischell that you simply don't recall at this time whether you saw the Hillstead patent in 1995 when it was sent to you?

A.     When I looked through what was sent to me, I may have looked at it.  It's possible, but I have no recollection of having seen it.

D.I. 1054, Tr. 852:1-6; *see also id.*, Tr. 848:25-49:20, 852:17-53:1, 915:22-916:4.

Second, when Dr. Fischell then testified that he was unaware of Hillstead until 1998, he admitted that it was his "general practice" upon receiving a search report from Mr. Rosenberg to "look at the pictures" of the references to "see if [the pictures] looked like [his] invention," and he offered no explanation of why he would have violated this "general practice" in the case of the most important material reference—Hillstead:

Q.     And you did look through [Hillstead], did you not?

A.     No, not necessarily.  Even though it's a general practice of mine, when he sends me things, to glance through them. …

*Id.*, Tr. 852:17-20.

Q.     You were unaware of [Hillstead] even though it was your practice to look through the figures in the patents that Mr. Rosenberg sent you?

A.     Yes, I was unaware.

*Id.*, Tr. 853:23-54:1; *see also id.*, Tr. 842:4-43:22, 845:10-46:20, 848:9-53:1, 887:20-22.

Third, Dr. Fischell testified inconsistently at trial and at his deposition in this case about his understanding during the '312 prosecution of whether any prior art disclosed undulating longitudinal structures.  At trial, Dr. Fischell testified on direct that he disclosed the prior art Lam reference to the Patent Office during the '312 prosecution because he (mistakenly) understood that it disclosed undulating longitudinals:

_____

credibility determinations (including observations about demeanor) about the witnesses who testified, including Dr. Fischell, who testified for several hours.

Q.    Okay. Did the submission of new Claim 28 in your application for
the '312 patent have any relation to the [Lam] reference that you
are reciting to the Patent Office?

A.    Yes.

Q.    And can you explain that?

A.    Well, the Lam reference was the first reference that I knew of that
appeared to have undulating longitudinals and, therefore, since I
became aware of it, I wanted us to file it with the Patent Office.
But we wanted to get a claim that had undulating longitudinals
based on our invention that was different from it. So we discussed
that it would have undulating longitudinal structures which include
straight sections and undulating sections joined continuously.
And, therefore, that would, by writing it that way, we were
overcoming the Lam reference which had undulating longitudinals.

*Id.*, Tr. 920:6-22; *see also id.*, Tr. 918:7-19:4, 925:23-26:7. In deposition testimony read

to him at trial for impeachment on cross-examination, however, Dr. Fischell had testified

that he had not considered any prior art to have undulating longitudinals:

Q.    "Question: At the time you've first recall learning about the
Hillstead patent, were you aware of any other patents within your
view disclosed a longitudinal element that had an undulating shape
in any sense of the word undulating?" And there is an objection.

"Answer: Well, there was a patent cited by the Patent Office
called Inoue, which the examiner was alleging it had some
longitudinals, but then I didn't – I know of no other and I'm not
even sure about Inoue so, no, I don't know of any other thing that
was cited that had anything resembling undulations in the
longitudinal direction." You gave that testimony too, didn't you?

A.    Yes.

*Id.*, Tr. 928:23-29:12. Dr. Fischell did not offer any explanation for this discrepancy.

Fourth, Dr. Fischell also testified inconsistently at trial and at his deposition in

this case about his conversations with Mr. Rosenberg at their meeting prior to filing the

June 1996 IDS and amendment. At trial, he professed to recall the meeting and testified

that the "Y" references in the search report (including Hillstead) were not discussed:

Q.      Now, at the time this IDS was filed in June of 1996, did you review the Y references to make a determination as to whether they should be cited to the Patent Office?

A.      No, we did not review them.

Q.      When you say we?

A.      Mr. — when I met with Mr. Rosenberg to file this, we never discussed any of the Y references.

Q.      Did you review them yourself prior to the meeting?

A.      No.

*Id.*, Tr. 917:17-25; *see also id.*, Tr. 925:23-28:3; D.I. 1055, 970:2-72:14, 987:15-20.  In deposition testimony read to him at trial for impeachment, however, Dr. Fischell testified that he could not recall any conversations with Mr. Rosenberg about these matters:

Q.      "Question:  Do you have a specific recollection of any conversations that you had with Mr. Rosenberg relating to either the [June 1996] supplementary amendment or the information disclosure statement that are referred to in his June 2 letter?  Answer: I have no specific recollection."

        You gave that testimony, didn't you?

A.      Correct.

D.I. 1054, Tr. 928:9-16; *see also* D.I. 1055, Tr. 1025:12-26:21.  Again, Dr. Fischell offered no explanation for this inconsistency.

        Finally, Dr. Fischell's testimony is not credible because he testified inconsistently about other matters when his financial interests were at stake.  At trial, he testified that he and his two sons conceived the invention during October and November 1993 and completed work when they were together at Thanksgiving:

Q.      Dr. Fischell, you began work on the invention that turned into the '312 patent in October 1993; correct?

A.      Yes.

11

D.I. 1054, Tr. 823:19-21.

> Q.    And you basically completed work on that invention over the
>        Thanksgiving Holiday in November 1993?
>
> A.    Yes.

*Id.*, Tr. 826:1-3; *see also id.*, Tr. 825:19-26:7, 901:9-11, 905:5-9.  On cross-examination,

however, Dr. Fischell was confronted with his sworn testimony in a prior action that the

invention was not conceived until after December 17, 1993.  In that prior action, it was in

Dr. Fischell's financial interest to establish that the invention was not conceived until

after December 17, 1993, because the plaintiff in that action had a contractual claim to an

ownership interest in any invention made by the Fischells prior to that date.  In testimony

from the prior action read to him at trial for impeachment, Dr. Fischell testified:

> Q.    The applications that were filed in 1994, did those applications for
>        the inventions that are under those applications encompass work
>        that was conducted prior to December 17, 1993?
>
> A.    No.
>
> Q.    So all work in regard to those inventions was conducted after
>        December 17, 1993?
>
> A.    Yes.

*Id.*, Tr. 902:4-11; *see also id.*, Tr. 891:20-904:25.  Again, Dr. Fischell had no explanation

for these inconsistencies.

### 3.    Cordis' Good Faith Explanations Are Not Credible

This Court should also find that Cordis' proffered good faith explanations for why

Hillstead was not disclosed during the '312 prosecution are unsupported and not credible.

First, Cordis' explanation that Dr. Fischell was not aware of Hillstead until April

1998 because he focused on Sgro in reliance on Mr. Rosenberg's statement in the July

1995 letter that Sgro was "the only reference" that was "particularly relevant" was

12

concocted by Cordis for litigation and is not credible. *Id.*, Tr. 840:14-42:3, 852:17-53:1, 890:13-18, 912:25-14:17; D.I. 1055, 985:24-86:23; DXB-11021.

Mr. Rosenberg's letter only identified Sgro as "particularly relevant to Claim 1" of the European application, which, unlike claim 8, did not contain the undulating longitudinal feature that Dr. Fischell understood was "an important way of distinguishing the prior art." D.I. 1054, Tr. 834:7-38:5, 853:8-16, DXB-11021; *Cordis*, 194 F. Supp. 2d at 362, ¶ 36. As discussed above, the letter enclosed the search report and only six cited references, including Hillstead, and stated that those materials were "enclosed for [Dr. Fischell's] review." D.I. 1054, Tr. 839:6-40:13, 848:9-49:2, 852:12-16, 912:25-13:5, DXB-11021; DXB-10004; PX-5313; *Cordis*, 194 F. Supp. 2d at 363, ¶ 37. Moreover, Dr. Fischell understood that he owed a duty of candor to disclose material prior art, that he alone had to determine whether the prior art cited in the search report was material, and that Mr. Rosenberg was not advising him about that issue for the U.S. prosecution. D.I. 1054, Tr. 830:12-31:23, 841:11-42:3; *Cordis*, 194 F. Supp. 2d at 362, ¶ 35.

Second, Cordis' explanation that Dr. Fischell and Mr. Rosenberg disclosed Lam in the mistaken belief that it disclosed undulating longitudinal structures was also concocted by Cordis for litigation and is not credible. Several figures in Lam plainly show that its undulations run circumferentially, not longitudinally.



PX-5044, Figs. 1-3.  As discussed above, at trial Dr. Fischell testified that he

(mistakenly) understood Lam to disclose undulating longitudinals, but at his deposition

he testified he did not consider any prior art to have undulating longitudinals.  Compare

D.I. 1054, Tr. 928:23-29:12 with *id.*, Tr. 918:7-19:4, 920:6-22, 925:23-26:7.

In sum, this Court should find that Dr. Fischell read the EPO search report, at

least looked at the Hillstead patent, and appreciated that Hillstead disclosed undulating

longitudinal structures during the '312 prosecution.

### B.     Dr. Fischell Cultivated Ignorance about the Existence and Materiality of Hillstead during the '312 Prosecution

The Federal Circuit also instructed this Court to elaborate on its finding in its

earlier opinion that "the patentees purposefully neglected their responsibility of candor to

the PTO by 'putting their heads in the sand' regarding prior art" and to "explain whether

that statement embodies findings that Dr. Fischell knew of the Hillstead patent and,

knowing that the Hillstead patent contained information that was likely material to the

patentability of the '312 application, purposefully avoided obtaining knowledge of the

details of that patent."  *Cordis*, 2006 U.S. App. LEXIS 16621, at *11 (quoting 194 F.

Supp. 2d at 367, ¶ 12).[7]

---

[7] The Federal Circuit provided the following context:

> Although as a general rule a party has no affirmative duty to search for
> relevant prior art, this court has stated that "one should not be able to
> cultivate ignorance, or disregard numerous warnings that material in-
> formation or prior art may exist, merely to avoid actual knowledge of that
> information or prior art."  *FMC Corp. v. Hennessy Indus., Inc.*, 836 F.2d
> 521, 526 n.6 (Fed. Cir. 1987); *see also Brasseler, U.S.A., I, L.P. v. Stryker
> Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir. 2001) ("Where an applicant
> knows of information the materiality of which may so readily be
> determined, he or she cannot intentionally avoid learning of its materiality,
> even through gross negligence; in such cases the district court may find
> that the applicant should have known of the materiality of the

14

This Court should explain that its earlier statement does embody such findings.

Specifically, this Court should find that, even if Dr. Fischell's assertion that he was not aware of Hillstead until April 1998 were accepted, that assertion could only be true if he deliberately and improperly cultivated ignorance about Hillstead and its details. Dr. Fischell's review of the July 1995 letter from Mr. Rosenberg put him on notice that the EPO search report contained information about the existence of potentially material prior art, including Hillstead. To the extent that Dr. Fischell did not look at the search report or the prior art cited therein as particularly relevant at that time, then he cultivated ignorance by purposefully avoiding obtaining knowledge of the contents of the search report and the details of Hillstead.

The following evidence (together with the evidence and lack of credibility of Dr. Fischell's contrary testimony discussed above) support these findings:

First, the July 1995 letter expressly stated that the EPO search report and cited references were "enclosed for [Dr. Fischell's] review." D.I. 1054, Tr. 839:6-40:13, 848:9-49:2, 852:12-16, 912:25-13:5; DXB-11021; *Cordis*, 194 F. Supp. 2d at 363, ¶ 37.

Second, the search report identified Hillstead and its figures as "particularly relevant" to the only claim in the European application with the undulating longitudinal feature, which Dr. Fischell understood was "an important way of distinguishing the prior

---

information."). Thus, no duty to inquire arises unless the applicant or the prosecuting attorney "is on notice of the likelihood that specific, relevant, material information exists and should be disclosed." *Brasseler*, 267 F.3d at 1383. In such a case, the applicant or prosecuting attorney is not free to choose "not to investigate the facts necessary to determine the materiality of the [reference] in an effort to avoid complying with their duty to disclose." *Id.* at 1382.

*Cordis*, 2006 U.S. App. LEXIS 16621, at *7-9.

DB01:2233188.1                                                                054152.1001

art." D.I. 1054, Tr. 833:6-16, 834:7-38:5, 853:8-16, 935:2-36:17; D.I. 1055, 958:2-63:16, DXB-10004; *Cordis*, 194 F. Supp. 2d at 362-63, ¶¶ 36, 38-39.

Third, Dr. Fischell understood that he owed a duty of candor to disclose material prior art, that he alone had to determine whether the prior art cited in the EPO search report was material, and that Mr. Rosenberg was not advising him about that issue for the U.S. prosecution. D.I. 1054, Tr. 830:12-31:23, 841:11-42:3.

Fourth, Dr. Fischell was "keenly interested" in stent designs and it was his "general practice" upon receiving a search report from Mr. Rosenberg to "look at the pictures" of the cited references to "see if [the pictures] looked like [his] invention." *Id.*, Tr. 842:4-43:22, 845:10-46:20, 848:9-53:1. Dr. Fischell acknowledged that when he looked at the front page of Hillstead he recognized that it showed undulating longitudinals. *Id.*, Tr. 853:8-12, 883:7-13, 889:9-16, 922:5-9; DXB-10045.

Fifth, in June 1996, after Dr. Fischell had appointed Mr. Rosenberg to represent him in connection with the '312 prosecution, Dr. Fischell identified for Mr. Rosenberg the prior art that he "felt was relevant" and should be disclosed to the Patent Office, including the Sgro reference cited in the EPO search report. D.I. 1054, Tr. 883:16-84:7. Dr. Fischell brought this prior art to a June 1996 meeting with Mr. Rosenberg at which they discussed which art should be disclosed. *Id.*, Tr. 916:23-17:12; D.I. 1055, 968:18-69:17, 971:13-22, 986:24-88:15. During that meeting, Dr. Fischell and Mr. Rosenberg discussed that the prior art they were planning to disclose came from the European application, but neither looked in the European prosecution file for any additional prior art. D.I. 1054, Tr. 917:13-25; D.I. 1055, 971:17-72:4, 972:21-73:11, 979:6-11.

Sixth, after the June 1996 meeting, Mr. Rosenberg prepared and submitted an IDS and amendment on behalf of Dr. Fischell. The IDS disclosed Sgro and stated that it had

16

been "cited in a corresponding Foreign Application of the subject Patent Application[,]"

but the IDS did not disclose Hillstead.  D.I. 1054, Tr. 883:14-15, 886:14-87:19; PX-5003,

Tab 30.  Moreover, the IDS and the amendment distinguished the prior art on the ground

that it did not disclose undulating longitudinals, but neither mentioned Hillstead, which

did disclose undulating longitudinals.  D.I. 1054, Tr. 884:8-86:13; PX-5003, Tabs 29, 30;

*Cordis*, 194 F. Supp. 2d at 365, ¶ 44.

Finally, even when Dr. Fischell testified that he was unaware of Hillstead until it

was brought to his attention in this litigation, he did not deny that both he and Mr.

Rosenberg had had copies in their offices since 1995:

> Q.    Did you bury your head in the sand, Dr. Fischell?  Were you trying
>       not to look at patents, at prior art?
>
> A.    I don't know how to take what you're saying.
>
> Q.    Well, I don't mean to be personally offensive, but this patent was
>       sitting in your office and it was sitting in Mr. Rosenberg's office,
>       and it showed undulating longitudinals at a time when you were
>       telling the Patent Office that a key distinction of your invention
>       was the prior art did not have undulating longitudinals.
>
> A.    I think sitting in my office is a mischaracterization of the facts.
>       When I get things in from Mr. Rosenberg, they often pile up
>       several inches on my desk amongst several inches of other paper,
>       then, when I go to file, I file it in the file marked foreign patents.
>       And I was never aware of it until this litigation and it was brought
>       to my attention, and that is the first time I was aware of it.

D.I. 1054, Tr. 888:13-89:5.

In sum, this Court should find that, if the finding that Dr. Fischell looked at

Hillstead and appreciated its significance in July 1995 is not upheld for any reason, then

at the very least, Dr. Fischell cultivated ignorance about Hillstead and its details by

purposefully avoiding obtaining knowledge about Hillstead.[8]

### C. Mr. Rosenberg Also Cultivated Ignorance about the Existence and Materiality of Hillstead during the '312 Prosecution

The Federal Circuit also instructed this Court to "determine whether its finding of inequitable conduct is based to any degree on the conduct of Mr. Rosenberg and, if so, what state of knowledge the court finds him to have had as to the existence and materiality of the Hillstead reference." *Cordis*, 2006 U.S. App. LEXIS 16621, at *11-12.

This Court should find that Mr. Rosenberg also deliberately and improperly cultivated ignorance about Hillstead and its details. Mr. Rosenberg's review of the EPO search report and Hillstead in connection with the European application in July 1995 put him on notice that his file for the European application contained information about potentially material prior art, including Hillstead. After he assumed responsibility for the U.S. '312 prosecution, and especially once he met with Dr. Fischell in June 1996 to discuss disclosing to the Patent Office prior art from the European prosecution, he cultivated ignorance by failing to look in his own European counterpart file, thereby purposefully avoiding refreshing his knowledge about the contents of the search report and the details of the prior art cited therein as particularly relevant, including Hillstead.

The evidence discussed above and the following evidence support these findings:

First, Mr. Rosenberg admitted that he reviewed the EPO search report and looked at Hillstead in July 1995 before sending them to Dr. Fischell:

---

[8] The Federal Circuit also stated that "we are uncertain whether the district court faulted Dr. Fischell merely for failing to conduct a prior art search, or whether the district court faulted Dr. Fischell for 'cultivat[ing] ignorance' with respect to the Hillstead reference." *Cordis*, 2006 U.S. App. LEXIS 16621, at *10. This Court should explain that it did not hold that Dr. Fischell was under any obligation to conduct a prior art search or that he was at fault for not conducting one, but rather that, as discussed above, to the extent he

> Q.    Now when you received the European search report in July 1995, what did you do with it after you had reviewed it, where did you store it?
>
> A.    I had copies made of the references, sent them off to Bob Fischell, and I put the—I looked at the documents, scanned the documents. I then put it into the EP file.

D.I. 1055, Tr. 988:16-22; *see also id.*, Tr. 955:18-63:16; DXB-11410; DXB-11411.

Second, the EPO search report was only three pages long, and the second page identified Hillstead and its figures as "particularly relevant" ("Y" reference) to claim 8 of the European application, which was the only European claim that included the undulating longitudinal feature.  D.I. 1054, Tr. 833:6-16, 935:2-36:17; D.I. 1055, 958:2-63:16; DXB-10004; PX-5313; *Cordis*, 194 F. Supp. 2d at 363, ¶¶ 38-39.

Third, Mr. Rosenberg is an experienced patent practitioner with over thirty years of experience.  D.I. 1055, Tr. 954:15-19.  He understood that once Dr. Fischell in March 1996 appointed him to take over the U.S. '312 prosecution, he thereafter owed a duty of candor to disclose material prior art to the Patent Office.  D.I. 1054, Tr. 858:2-4, 881:19-83:1, 916:9-12; D.I. 1055, 954:15-55:3, 965:13-68:17, 982:22-83:4; PX-5003, Tab 25.

Fourth, Mr. Rosenberg was specifically aware that the Patent Office rules admonish applicants and their attorneys to "carefully examine" prior art cited in foreign search reports and that the MPEP identifies foreign search reports as a source of material prior art that must be considered.  D.I. 1055, Tr. 967:6-68:17, 1028:21-29:6; 37 C.F.R. § 1.56(a); MPEP § 2001.06(a).  Yet, after assuming responsibility for the '312 prosecution, Mr. Rosenberg did not look for prior art in his file for the European application, which contained the EPO search report and Hillstead:

---

did not read or look at Hillstead after being put on notice of its existence and materiality, he cultivated ignorance about Hillstead and its details.

19

Q.      . . . Do you recall, as you sit here today, why you did not cite
Hillstead to the Patent Office?

A.      Because I did not look back and check the Hillstead reference. I
didn't check any of the references in the European search report.

D.I. 1055, Tr. 979:6-11; *see also id.*, Tr. 972:21-76:4, 979:6-80:9, 989:5-13, 989:18-20,

990:24-91:4. Nor did he conduct any investigation or analysis of whether he was aware

of potentially material prior art that should be disclosed:

Q.      And you are saying that you made no independent determination,
even though you were prosecuting the European application, as to
what additional prior art needed to be cited to the U.S. Patent
Office?

A.      That is correct.

*Id.*, Tr. 977:21-25; *see also id.*, Tr. 968:18-69:17, 979:6-11, 990:24-91:4.

Fifth, even though Mr. Rosenberg testified that he simply relied on Dr. Fischell to

identify the prior art that he "felt was relevant" and should be disclosed to the Patent

Office, he admitted (after disclosing only Sgro) that he never even asked Dr. Fischell if

there was any additional relevant prior art:

Q.      Did you ever ask Dr. Fischell if there was additional art that
needed to be cited to the Patent Office?

A.      No. Sometime in June, Dr. Fischell called me and asked for a
meeting. He wanted to file a supplementary amendment with an
IDS. And I said come on over, and he came over, he gave me
some prior art that he felt was relevant.

Q.      But apart from that you didn't ask him if there was any other prior
art?

A.      I don't believe so.

*Id.*, Tr. 969:8-17; *see also id.*, Tr. 916:23-17:12, 968:18-69:17, 986:24-88:15.

Sixth, Mr. Rosenberg did not look at his European file even though, when he

asked Dr. Fischell where the art he brought to their June 1996 meeting came from, Dr.

Fischell responded "from . . . the foreign application." *Id.*, Tr. 971:17-72:4. Indeed, after the meeting, Mr. Rosenberg prepared and submitted an IDS and amendment on behalf of Dr. Fischell that, according to Mr. Rosenberg's records, were "based upon the Foreign Application prosecution." D.I. 1054, Tr. 881:19-83:1; D.I. 1055, 974:22-75:12; DXB-11026; DXB-12092; PX-5003, Tabs 29, 30. The IDS disclosed Sgro and stated that it had been "cited in a corresponding Foreign Application of the subject Patent Application[,]" but the IDS did not disclose Hillstead, even though it was cited in the same counterpart foreign application as Sgro, and even though Hillstead—not Sgro—was critically relevant to the undulating longitudinal feature and would have precluded the argument they were making in the accompanying amendment. D.I. 1054, Tr. 883:14-15, 886:14-87:19; D.I. 1055, 977:3-20; PX-5003, Tabs 29, 30.

Seventh, Mr. Rosenberg fully understood the importance of the undulating longitudinal feature disclosed in Hillstead to the patentability of the claims he was prosecuting. Specifically, the IDS and the amendment which Mr. Rosenberg prepared and submitted specifically distinguished prior art on the ground that it did not disclose undulating longitudinals, but neither the amendment nor the IDS mentioned Hillstead, which disclosed undulating longitudinals. D.I. 1054, Tr. 884:8-86:13; PX-5003, Tabs 29, 30; *Cordis*, 194 F. Supp. 2d at 365, ¶ 44. Moreover, in November 1996, after claims that contained the undulating longitudinal feature had been allowed, Mr. Rosenberg submitted another amendment on behalf of Dr. Fischell that amended all the rejected claims to include the undulating longitudinal feature and again argued that the prior art did not disclose this feature. PX-5003, Tabs 33, 36; *Cordis*, 194 F. Supp. 2d at 365, ¶ 44.

In sum, this Court should find that Mr. Rosenberg cultivated ignorance about Hillstead by purposefully failing to look in his own European counterpart file, and

21

thereby avoiding refreshing his knowledge about the details of Hillstead.

## II.    The Unenforceability of the '370 Patent

The Federal Circuit also instructed this Court to "specify its reasoning in sufficient detail to make clear the grounds for its conclusion that the nondisclosure in connection with the '312 patent prosecution carried over to the '370 prosecution." *Cordis*, 2006 U.S. App. LEXIS 16621, at \*14-15.

This Court should find that the failure to disclose Hillstead during the '312 prosecution tainted the '370 prosecution, and that this inequitable conduct was not cured by the later disclosure of Hillstead during the '370 prosecution.

### A.    The Inequitable Conduct Committed during the '312 Prosecution Tainted the '370 Prosecution

The evidence discussed above and the following evidence support the finding that the failure to disclose Hillstead during the '312 prosecution tainted the '370 prosecution.[9]

---

[9] The Federal Circuit provided the following context:

> The principle that conduct pertaining to one patent can taint another patent can be traced back at least to the Supreme Court's decision in *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 54 S. Ct. 146, 78 L. Ed. 293, 1934 Dec. Comm'r Pat. 639 (1933). We have applied that principle in a variety of contexts. *See, e.g., Agfa Corp. v. Creo Prods. Inc.*, 2006 U.S. App. LEXIS 15986 \*30, No. 05-1079 (Fed. Cir. June 26, 2006) (continuation patent unenforceable based on inequitable conduct found in the prosecution of the parent application); *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 812 (Fed. Cir. 1990) ("Consolidated's concealment of the [best mode] from the '917 patent permeated the prosecution of the other patents-in-suit [which descended from the '917 patent] and renders them unenforceable."); *Driscoll v. Cebalo*, 731 F.2d 878, 885 (Fed. Cir. 1984) (an applicant who "has withheld from the PTO prior art material to a claim in a parent application should not be exculpated simply because, by fortuitous circumstances, the PTO has not reached the stage of allowing claims in a continuing application."). The relevant inquiry is whether the "inequitable conduct in prosecuting the [parent] patent had immediate and necessary relation to

First, the claims of the '312 and '370 patent are closely related. The application that issued as the '370 patent is a continuation of, and has identical figures and a virtually identical description as, the parent application that issued as the '312 patent. Compare PX-5000, cover, Figs. 1-9, 1:1-4:53 with PX-5001, cover, Figs. 1-9, 1:1-4:53.

Second, a primary basis for patentability of the claims in each application was the same undulating longitudinal feature. All but one claim of the '312 patent, and every claim of the '370 patent, includes the undulating longitudinal feature that was disclosed by Hillstead and repeatedly emphasized during the '312 prosecution to distinguish the prior art. Compare PX-5000, 4:55-7:19 with PX-5001, 4:55-6:49. In short, the claims of the '312 and '370 patents both claim the same subject matter and are closely related.

In sum, this Court should find that the inequitable conduct committed during the '312 prosecution has an immediate and necessary relation to the enforcement of, and thus tainted, the '370 patent.

### B. Dr. Fischell, Mr. Rosenberg (and Cordis) Did Not Cure the Inequitable Conduct during the '370 Prosecution

The Federal Circuit further instructed this Court to address "whether the disclosure of the Hillstead patent [during the '370 prosecution] 'cured' any inequitable conduct in the '312 prosecution, or whether, in light of the context in which the Hillstead patent was disclosed and the applicant's characterization of the prior art, that disclosure failed to cure the taint." *Cordis*, 2006 U.S. App. LEXIS 16621, at *14-15 (citing *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1572-73 (Fed. Cir. 1983)).

---

the . . . enforcement of the [child] patents." *Consol. Aluminum*, 910 F.2d at 810-11.

*Cordis*, 2006 U.S. App. LEXIS 16621, at *12-13.

23

This Court should find that the disclosure of Hillstead to the Patent Office during the '370 prosecution did not "cure" the inequitable conduct committed during the '312 prosecution because Dr. Fischell and Mr. Rosenberg (and Cordis) did not "expressly advis[e] the PTO of [the previous act of inequitable conduct], stating specifically wherein it resides," as required by the "cure" doctrine of *Rohm & Haas*.  722 F.2d at 1572.

The evidence discussed above and the following evidence supports these findings.

First, Dr. Fischell and Mr. Rosenberg prosecuted the continuation '370 application before the same examiners, Michael Buiz and William Lewis, as the parent '312 application.  PX-5000, cover; PX-5001, cover.

Second, despite both having copies of Hillstead and the EPO search report that described Hillstead and its figures as "particularly relevant" to the only claim in the European application that included the undulating longitudinal feature, they repeatedly argued to these examiners during the parent '312 prosecution that the prior art did not disclose the undulating longitudinal feature.  D.I. 1054, Tr. 833:6-16, 834:7-38:5, 853:8-16, 884:8-86:13, 935:2-36:17; D.I. 1055, 958:2-63:16; DXB-10004; PX-5313; PX-5003, Tabs 20, 29, 30, 36; *Cordis*, 194 F. Supp. 2d at 362, ¶ 36, 363, ¶¶ 38-39, 365, ¶¶ 44-45.

Third, during the '370 prosecution before the same examiners, Dr. Fischell and Mr. Rosenberg (and Cordis) did not advise the examiners that Hillstead disclosed the undulating longitudinal feature that they had previously relied upon for patentability, and that they had repeatedly and falsely told the examiners the prior art did not disclose. *Cordis*, 194 F. Supp. 2d at 367, ¶12.  Nor did they advise the examiners that, during the '312 prosecution, they both had copies of Hillstead and the EPO search report but did not disclose Hillstead.  They failed to advise the examiners about any of this, even though Dr. Fischell made notes after meeting with Cordis' litigation counsel in April 1998 that the

24

new claims in the '370 application had to be "clearly allowable over Hillstead." D.I. 1054, Tr. 889:6-23.

Instead, in May 1998, shortly after the meeting with Cordis' counsel, Dr. Fischell and Mr. Rosenberg (and Cordis) quietly buried Hillstead among some sixty other references in an IDS, said nothing about it, and never referred to it again. *Id.*, Tr. 921:10-23:1; D.I. 1055, 980:13-18; PX-5002, Tabs 16, 18; *Cordis*, 194 F. Supp. 2d at 365, ¶ 49.

This Court should find that this cryptic disclosure of a previously withheld material prior art reference to the same examiners who were previously deceived to believe that the prior art did not disclose undulating longitudinals is insufficient to "cure" the earlier inequitable conduct.

## CONCLUSION

In accordance with the Federal Circuit's mandate, BSC respectfully submits that the Court should make the supplemental findings proposed above in support of its judgment that the '312 and '370 patents are unenforceable.

Respectfully submitted,

November 13, 2006

/s/ *Karen E. Keller*
Josy W. Ingersoll (I.D. #1088)
Karen E. Keller (I.D. #4489)
YOUNG CONAWAY STARGATT &
  TAYLOR, LLP

Of Counsel:
George E. Badenoch
Albert J. Breneisen
Mark A. Chapman
William M. Merone
Huiya Wu
KENYON & KENYON LLP
One Broadway
New York, New York 10004
(212) 425-7200

The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6600
kkeller@ycst.com
Attorneys for Defendants
Boston Scientific Corporation,
and Boston Scientific Scimed, Inc.
(formerly Scimed Life Systems, Inc.)

## <u>CERTIFICATE OF SERVICE</u>

I, Karen E. Keller, Esquire, hereby certify that on November 13, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Balick Esquire
> John G. Day, Esquire
> Ashby & Geddes
> 222 Delaware Avenue
> P.O. Box 1150
> Wilmington, DE 19899

I further certify that on November 13, 2006**,** I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY ELECTRONIC MAIL AND FEDERAL EXPRESS**

> William F. Cavanaugh, Jr., Esquire
> Eugene M. Gelernter, Esquire
> Patterson, Belknap, Webb & Tyler
> 1133 Avenue of the Americas
> New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*

Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
(302) 571-6600
apoff@ycst.com

Attorneys for Boston Scientific Corporation and Boston Scientific Scimed, Inc.